UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| JACQUELYN R. BIGGS, and | ) | |
| SHERRIE D. STEPHENS, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | No. 1:14-cv-00182-LJM-TAB |
| vs. | ) | |
| | ) | |
| BRANDYE HENDRICKSON, and | ) | |
| JAY WASSON, | ) | |
| | ) | |
| Defendants. | ) | |

## ORDER ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Defendants Brandye Hendrickson ("Hendrickson") and Jay Wasson ("Wasson") (defendants, collectively, "Defendants") have moved for summary on the claims brought against them by Plaintiffs Jacquelyn R. Biggs[1] ("Biggs") and Sherrie D. Stephens ("Stephens") (collectively, "Plaintiffs") under the Age Discrimination in Employment Act of 1967 ("ADEA"), 29 U.S.C. § 623. Defendants assert that neither Biggs nor Stephens can show that they are entitled to relief under any theory of age discrimination as a matter of law and that they had a legitimate, non-discriminatory reason to terminate both Biggs' and Stephens' employment. Plaintiffs contend that there are material questions of fact that preclude summary judgment.

For the reasons stated herein, the Court, **GRANTS in part and DENIES in part** Defendants' Motion for Summary Judgment.

---

[1] Biggs married after this lawsuit commenced and is now known as Jacquelyn VanHooser. To simplify the facts, at all times the Court will refer to her as "Biggs."

# I.  BACKGROUND

## A.  BIGGS' RELEVANT EMPLOYMENT HISTORY

On February 12, 2007, Biggs began working at the Indiana Department of Transportation ("INDOT").  Biggs Dep. at 7, 12.  Since that time, she obtained a principal broker's license.  *Id.* at 8-9.

When Biggs began her employment at INDOT, she signed an "Employee Handbook Acknowledgement Form" that states that the employee received an employee handbook and agrees to review and abide by its contents.  *Id.* at 23; Biggs Dep. Ex. 1. The Policy Statement contained within the Employee Handbook states:  "It further recognizes that employees and officers occasionally need to use State resources for emergencies and other occasional and infrequent personal activities that cannot be reasonably handled away from work." Biggs' Dep. at 24-25; Biggs Dep. Ex. 1 at 2.  The Employee Handbook puts the following limits on personal use of State resources and time: (1) "The use must not interfere with work performance of public duties," Biggs Dep. at 25; Biggs Dep. Ex. 1 at 2; and (2) "The use must not be for the purpose of conducting business related to an outside commercial activity," Biggs Dep. at 25; Biggs Dep. Ex. 1 at 2.  Biggs explained this policy and limitations, stating, "I know that you're not supposed to use the computers for private business."  Biggs Dep. at 25.

In 2011, when Bob Hazzard ("Hazzard," age 60) was her supervisor, Biggs received two promotions.  *Id.* at 19-20.  Hazzard explained that "she took it upon herself to do better," and she "rose to the top."  Hazzard Dep. at 37-38.  According to Hazzard, Biggs was "adept at realizing ahead of time we have an issue, we have a problem that needs to get solved" and she "took that risk and chose to do her best to correct [it]."  *Id.*

at 39-40.  Biggs would work extra hours to get the job done and during Hazzard's tenure, Biggs' work was "outstanding" and she was a "team player."  *Id.* at 72.  As of November 2011, Biggs' job title was Program Director 1 in the Real Estate Division.  Biggs Dep. at 20.

Biggs has been an Avon representative since approximately 1996.  *Id* at 26.   She sells mostly to friends and co-workers.  *Id.* at 26-28.  With respect to co-workers, generally Biggs would leave catalogs or products for her customers at their desks before or after work, or during her lunch hour, or, occasionally, during a short work break.  *Id.* at 29-31. Although Biggs asked her customers to contact her about Avon sales matters on her personal email account, sometimes they would send her orders on her State email account.  *Id.* at 30.  Biggs testified that when she received an email about her Avon business on her State computer, she would respond by saying, "I'll look into when I get home."  *Id.*

However, on November 1, 20, and 21, 2011, Biggs sent emails to several Avon customers and INDOT employees on the State email system using the State computer regarding their Avon orders.  Biggs Dep. at 35-39; Biggs Dep. Exs. 4, 6 & 7.   Biggs admitted that she was not on a "break" for at least one of these occurrences.  Biggs Dep. at 35-38.  Similarly, on December 6 and 19, 2012, Avon customers and INDOT employees sent Biggs individual email asking a question about Avon products; Biggs later responded on her State computer twice to one customer and once to the other.  *Id.* at 33-34, 36-37; Biggs Dep. Exs. 2 & 5.  On December 18, 2012, Biggs corresponded with an Avon customer and INDOT employee on her State computer and email system and did not forward the email to her personal account.  Biggs Dep. at 34-35; Biggs Dep. Ex. 3.  In

3

addition, Biggs had Avon products and magazines lying out at her State desk and also had a bag of them at her INDOT workspace.  Biggs Dep. at 32, 40-41; Biggs Dep. Ex. 8. Sometimes, Avon customers would stop by her desk to pick up their Avon orders and/or a magazine.  *Id.* at 33; Biggs Dep. Ex. 8.  Biggs used an entire drawer at her INDOT work desk to store Avon products.  Biggs Dep. at 41; Biggs Dep. Ex. 8.  In fact, Biggs testified that she would deliver Avon products while she was working and that she did not take "breaks."  Biggs Dep. at 21-22, 36.

Biggs testified that other INDOT employees had other outside businesses in addition to their employment with INDOT that they performed while at work.  Biggs Dep. at 25, 34, 67, 69, 71, 73, 74, and 89.  Further, Biggs testified that she asked her first manager at INDOT, Bob Souchon ("Souchon"), if she could sell Avon and he told her it was not a problem.  Biggs Dep. at 42.  Hazzard, Biggs' supervisor until his termination of employment about a month before Biggs', knew that she sold Avon and testified that he had no problem with it.  Hazzard Dep. at 66, 75.  Hazzard also recalled that other INDOT employees sold Avon, Girl Scout cookies, candy for school organizations, etc., in the office.  *Id.* at 66-67.  In addition, Hazzard testified that INDOT employees would use bulletin boards or their cubicle walls to advertise things for sale, such as cars.  *Id.* at 76. At least one other employee testified that employees would use State bulletin boards to sell things.  Fox Dep. at 30-31.

Hazzard knew that Biggs sold Avon during lunch, during breaks and before work. *Id.* at 67-68.  He claims that if there was a problem with her practices, it would have been appropriate to warn her about it.  *Id.*  Hazzard further recalled that the Deputy Commissioner for Human Resources was one of Biggs' customers.  *Id.* at 68-69.  Hazzard

4

testified that the State policy regarding use of State computers was "abused all the time" and if he had been asked to fire Biggs for that reason, he would have said, ". . . get real. Come on.  This is not . . . revealing corporate secrets.  This is not literally stealing.  She puts in more time than what the State is compensating her for."  *Id.* at 74.  Hazzard testified that the employee who made a complaint about Biggs' Avon business practices, Loren Myers ("Myers"), had problems with work performance.  *Id.* at 80-81.   According to Hazzard, Myers would spend a lot of his time handling business for the Lion's Club, such as organizing fundraising events, while on work time.  *Id.*  Further, Hazzard testified that about six weeks after Scott Adams ("Adams") was hired by INDOT in 2010 as Real Estate Director, managers, including Hazzard, were told to lighten the load of employees by choosing elderly, physically handicapped and black employees for dismissal.  *Id.* at 9-11, 19.  Hazzard claims that Adams wanted managers to "document the outcome you are going to give that person."  *Id.* at 141.

Biggs testified that she knew of an INDOT employee, in her 40s, who was selling Mary Kay cosmetics and not fired.  Biggs Dep. at 72-73; Biggs Interrog. Resps, at 6.  Another women in her 40s sold Girl Scout cookies at work all day long, supervisors bought them, and the women was not fired.  *Id.* at 89-90.  Similarly, an administrative assistant, also sold Girl Scout cookies.  Fox Dep. at 25-26.  Deputy Commissioner Jay Wasson sold Girl Scout cookies at work for his daughter.  *Id.* at 22-23.  Biggs testified that around the time INDOT terminated her employment, a female employee who was selling scarves out her cubicle was told to stop doing it, but was not fired.  *Id.* at 25.

Biggs claims that on March 28, 2013, the day she was fired, Adams escorted her to Human Resources where she was told by Wasson and Jeff Sullivan ("Sullivan")

(Human Resources Director for the Indiana State Personnel Department and imbedded with INDOT in February 2013, performing its human resources function; Jeff Sullivan Decl. ¶¶ 2-3), that she was fired because she was selling Avon.  Biggs Dep. at 45-46, 81-82.  There is no evidence that Biggs was warned about the potential that her Avon activities would be cause to fire her or that she was put on a work improvement plan ("WIP") prior to being fired.

Biggs' termination letter[2] dated March 28, 2013, sets out the following reason for her discharge:  "During today's meeting we discussed instances of poor judgment and how this does not meet agency standards and is unacceptable performance."  Jeff Sullivan Decl. ¶ 10.  Both Adams and Sullivan claim that this was the reason that Biggs' employment was terminated.  Scott Adams Decl. ¶ 12; Jeff Sullivan Decl. ¶ 12.  Biggs was 53 years old on the date her employment at INDOT was terminated.  Biggs Dep. at 78.  According to Adams and Sullivan, Biggs was counseled several times by her managers that she was expected (1) to be a technical resource for her subordinates, (2) to lead by example, and (3) to follow all policies and procedures of both INDOT and the Real Estate Division.  Scott Adams Decl. ¶¶ 6, 8, 10; Jeff Sullivan Decl. ¶¶ 9-10.  Despite this counseling, Biggs failed to bring her performance in line with her managers' reasonable expectations.  Scott Adams Decl. ¶ 12; Jeff Sullivan Decl. ¶¶ 9-10.  Biggs denies that she was ever "counseled" by anyone regarding her performance.  VanHooser/Biggs Decl. ¶¶ 4-10.

---

[2] Subsequent to her termination, Biggs requested, and INDOT permitted, her discharge to be changed to a "resignation."  Melissa Martin Decl., Ex. 2.

Biggs testified that, notwithstanding the fact that age had never been mentioned when she was terminated, she felt she was a target because INDOT wanted to find a spot for Don Ballard (age 60), the brother of Indianapolis Mayor Greg Ballard, and she was over 50 years old. Biggs Dep. at 47-48, 52-53. However, there were other positions for which Biggs was qualified at INDOT, including property management work. Hazzard Dep. at 117, Hazzard Dep. Ex. 2; Biggs Dep. at 89; Fox Dep. at 55. Those positions were filled by four people under age 30. *Id.*

Biggs also believed that Adams and other managers at INDOT, including Mike Jett ("Jett"), had targeted other older employees. Biggs Dep. at 50, 52, 74-75. These included Sandy VanDine ("VanDine") and Beverly Cox ("Cox"). *Id.*; Beverly Cox Aff. But, Biggs never complained to management or anyone in human resources about her beliefs. Biggs Dep. at 53.

Rick Fox ("Fox"), testified that he is the human resources person assigned to INDOT. Fox Dep. at 5. Fox's supervisor, Sullivan, asked him for a recommendation to terminate Briggs' employment. Fox Dep. at 14. Fox declined to write a recommendation because he knew that other people sold items like Girl Scout cookies and selling Avon was not a reason to terminate Biggs. *Id.* at 14-16. According to Fox, he was aware that Hazzard had no problem with Biggs' selling Avon at work; Fox never told anyone that Biggs had Hazzard's permission to sell Avon in the workplace. *Id.* at 19-21.

Fox testified that, although progressive discipline was no longer legally required, it should still be done under State human resources guidelines. *Id.* at 16-17. Fox knew that no progressive discipline was used in Biggs' case. *Id.* Fox was unaware of any performance issues with respect to Biggs' or of any warnings issued to her; but such

7

issues were being handled by Sullivan.  *Id.* at 30, 32-33.  He explained that if an employee had performance problems, she was put on a WIP; he agreed that if Biggs had such problems, she should have been put on one.  *Id.*  Based on the evidence that he saw, Fox testified that Biggs should not have been fired, but a suspension would have been appropriate.  *Id.* at 17, 63.

## B. STEPHENS' RELEVANT EMPLOYMENT HISTORY

Stephens began working at INDOT in 2003.  Stephens Dep. at 20.  Since her start date, Stephens obtained her real estate broker's license.  *Id.* at 12, 15.  Beginning in 2011, Stephens joined the property management division of the real estate division as a "Pat 4."  *Id.* at 27.  Steve Catron ("Catron") was Stephens' supervisor in the property management division and was a couple of years older that Stephens.  *Id.* at 29.  Catron was supervised by Adams, who was approximately 40 years old.  *Id.* at 29-30.

Stephens had satisfactory annual employment evaluations until the middle of 2013.  *Id.* a 31, 33, 34, 42.  On the first performance appraisal in January 2013, Stephens testified that she received a satisfactory recommendation.  *Id.* at 36.  Defendants allege that Stephens' January 2013 performance review evidences problems, but the Court could not locate the appraisal.  *Compare* Dkt. No. 45 at 8, ¶ 7 (citing "Exhibits 1-2 to Stephens Dep."), *with* Dkt. No. 46 (Defendants' Exhibits).

The mid-year appraisal, signed and dated July 16, 2013, by Catron only, indicates that Stephens was not meeting the minimum standards of performance.  Stephens Dep. Ex. 1 at 3.  Specifically, under "Results" for her first performance expectation, the mid-year 2013 appraisal indicated that Stephens had difficulty when processing payments.  Stephens Dep. at 39, Stephens Dep. Ex. 1 at 2.  Similarly, with respect to the second

performance expectation, the mid-year 2013 appraisal indicated that Stephens failed to meet that expectation because she struggled to "accurately update[e] the LRS with critical parcel information as well as communications with property owners and financial institutions."  Stephens Dep. Ex. 1 at 2.  The mid-year 2013 appraisal notes that Stephens met the three other performance expectations listed on the form.  *Id.*

Stephens testified that she refused to sign the mid-year 2013 appraisal because the information contained in it was not true.[3]  Stephens Dep. at 39-40.  Further, Stephens alleges that Catron told her that Jett instructed him that he had to issue a bad evaluation to Stephens or his job would be in jeopardy.  *Id.* at 41, 43.

On July 15, 2013, Stephens received a WIP.  Stephens Dep. at 50-52; Stephens Dep. Ex. 3 at 1.  The WIP specifically noted the deficiencies in Stephens' performance identified in the mid-year 2013 appraisal.  *Id.*; Stephens Dep. at 60.  The WIP was reviewed with Stephens and identified specific goals that Stephens needed to meet all of them related to Stephens' duties in the property management group.  Stephens Dep. at 51, 64-65; Stephens Dep. Ex. 3 at 1.

A short time later, around or about August 7, 2013, Adams pulled three employees from their positions in property management and reassigned them to handle "excess land;" one of them was Stephens.  *Id.* at 42, 45, 51.  Previously, this position did not exist at INDOT; such sales were handled by an outside company.  *Id.* at 109; Hazzard Dep. Ex. 2.  In addition to Stephens, Hazzard (age 64) and Mr. Brown (age 64) were assigned to the new group.  Stephens Dep. at 53; Hazzard Dep. Ex. 2.  Stephens, Hazzard and

---

[3] Apparently there was a short form of this appraisal as well that Stephens also refused to sign for the same reason.  Stephens Dep. at 48.

Brown thought the project was doomed because the outside company never had success in selling excess land and the three of them did not see how they could be any more successful doing so from within INDOT.  Stephens Dep. at 54, 56, 58, 84; Hazzard Dep. at 25-26.  At that point in time, Jeff Hinrichs ("Hinrichs," age 49) supervised the "excess land" group.  Stephens Dep. at 54.  The property management duties previously performed by Catron, Brown and Stephens were given to the two individuals who had worked at the outside company trying to sell excess land; they were ages 26 and 34.  Stephens Dep. at 56-57; Hazzard Dep. Ex. 2.

No one ever revised Stephens' WIP to apply to her new position in excess land.  Stephens Dep. at 64-65.  Further, the WIP expressly stated that a supervisor would meet with Stephens "in person, biweekly for 60 days" to ensure that she was performing the requirements of the WIP.  Stephens Dep. Ex. 3.  This never happened; Hinrichs met with Stephens about the WIP once, two days prior to the day her employment with INDOT ended.

After Stephens' transfer to the new "excess land" role, INDOT documented three conversations with Stephens regarding behavioral issues.  Stephens Dep. Exs. 4-6.  First, on August 26, 2013, Stephens wore a Hard Rock Café t-shirt to work and was told it was inappropriate, even on Fridays when jeans were permissible.  Stephens Dep. Ex. 4.  Stephens testified that she was told she could not wear that t-shirt, but she was never shown a written write up.  Stephens Dep. at 69-70.

Second, on September 3, 2013, Stephens was two hours late to work because of an emergency and asked her supervisors if she could make up the time.  Stephens Dep. Ex. 5.  According to the written notes, Jett and Hinrichs agreed that she could make up

10

the time, but it was explained that unless there were extraordinary circumstances, make-up time would not be allowed in the future; Stephens need to manage her time better and use vacation or personal time for emergencies.  *Id.*  However, Stephens testified that she never saw a written note about this incident.  Stephens Dep. at 72-73.  Stephens stated that Jett knew she was going to be late and did not have any time to take, but said, "Okay." *Id.* at 74.  According to Stephens, Jett told her to get Hinrichs' approval for any make-up time, but Hinrichs did not approve it.  *Id.* at 74-75.

Third, on September 12, 2013, Stephens received a written reprimand because, when given an assignment by the new property management supervisor, Mike Kuehl ("Kuehl," aged 33), she

> became confrontational telling [him] that it was "Bulls*#t!" and that "it should have been done years ago" by people that were formally in Property Management.  She continued to challenge the assignment as [the supervisor] attempted to explain why it need to be completed.  She eventually relented and agreed to take on the assignment.

Stephens Dep. Ex. 6.  Stephens testified that she knew about this incident and was aware that Kuehl was going to write it up, but had not seen the written reprimand; she did tell Hinrichs that she would not sign the write up.  Stephens Dep. at 75, 78-29.  Stephens claimed that at the time Kuehl approached her about this project, she was working in another division and felt it was not her responsibility to update someone else's work for the last four years; but she did the work anyway.  *Id.* at 76-77.

After the last incident, Stephens met with Hinrichs and Jett to discuss her WIP. Stephens Dep. at 80-81.  She presented a spreadsheet of work she had performed in "excess land."  *Id.*

Stephens testified that she also tried to talk with Catron and Fox about the fact that her WIP did not relate to her current job duties. *Id.* at 66-67, 97-98. Catron told her that he did not know whether or not the WIP would be changed, but she should not worry about it. *Id.* When she went to Fox, she told him, "I'm old and I feel they're pushing me out . . . . They've demoted all of us that were doing . . . property management . . . they brought in people from the outside agency to take our jobs." Stephens Dep. at 66-67, 97-98. Fox told her "not to worry . . . they couldn't fire [her] because of the work improvement because they didn't update it." Stephens Dep. at 97-98. Fox recalls Stephens telling him that she thought she would be fired because of her age and that other employees were being forced out because of age. Fox Dep. at 37-38. Although Stephens declined to file an official complaint, Fox explained that under human resources procedure, he needed to ask his supervisor whether or not an investigation should be conducted. *Id.* at 38-39. Fox talked with his supervisor, Sullivan, who told Fox not to do an investigation; Sullivan did not tell Fox why not. *Id.*

On September 16, 2013, Stephens told Jett that she had spoken to Fox about her concerns. Stephens Dep. at 97; Fox Dep. Ex. 7. At some point, Stephens apparently told Jett that "she felt like we were pushing her out because she was female and over 60." Fox Dep. Ex. 7. Fox claims that he was unaware of this; but testified that Jett should have told someone in human resources about Stephens' comment. Fox. Dep. at 40-41.

On September 18, 2013, within a few days after meeting with Hinrichs and Jett to discuss her WIP and her conversation with Fox, Stephens claims that Jett and Wasson met with her and fired her stating, "We don't think you're a fit for INDOT. Goodbye." *Id.* at 81-82, 85, 97; Fox Dep. Ex. 7. Stephens asked to say something and Wasson said,

"No, it's already been decided.  It doesn't matter what you say."  Stephens Dep. at 81-82, 85.  Fox verified that Stephens' employment was terminated.  Fox Dep. at 43-44.  INDOT claims, however, that on or about September 18, 2013, Stephens submitted her resignation.  Melissa Martin Decl. Ex. 3; Stephens Dep. at 84.  She was 60 years old at the time.  Stephens Dep. at 9.

Fox testified that he wrote up Stephens' termination letter, but was never told that her actual job duties were not in her WIP.  Fox Dep. at 47-48.  Fox said it would have been Hinrichs' responsibility to update the WIP.  *Id.*  Further, if management had not completed their responsibilities under the WIP, then Fox would advise the manager to give the employee an extension and then work through the plan.  *Id.* at 57.  No one brought Fox a completed WIP for Stephens and he could not explain why he had never spoken with a manager about it.  *Id.* at 58-59.

Fox stated that he was never told that Stephens was transferred to "excess land;" Jett hired the new, younger employees in property management, although human resources should have been involved.  Fox Dep. at 48-49.

Eventually, Catron (age 65) and Brown (age 64) decided to retire.  Stephens Dep. at 83; Hazzard Dep. Ex. 2.  When Brown retired, Brian Hoyer (age 60) was assigned to "excess land," but he later quit.  Stephens Dep. at 83.  Younger people replaced Stephens and the others in property management, ages 33, 25, 27 and 22; they were all paid more than the older employees as well.  Hazzard Dep. Ex. 2; Stephens Dep. at 83-84, 101-02, 116.  Hazzard and Stephens testified that the new, younger workers who had no experience in INDOT were desired by management because they would not be hampered with knowing state and federal regulations like the older, more experienced workers.

13

Stephens Dep. at 119; Hazzard Dep. at 28-29, 33.  Further, Hazzard testified that when he was a manager, he felt pressured by Adams to get employees to retire.  Hazzard Dep. at 60-61.

Stephens testified that Hinrichs had referred to her and Catron as "old people."  Stephens Dep. at 105.

## II. <u>STANDARDS</u>

### A. SUMMARY JUDGMENT

As stated by the Supreme Court, summary judgment is not a disfavored procedural shortcut, but rather is an integral part of the federal rules as a whole, which are designed to secure the just, speedy, and inexpensive determination of every action.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986).  *See also United Ass'n of Black Landscapers v. City of Milwaukee*, 916 F.2d 1261, 1267–68 (7th Cir. 1990).  Motions for summary judgment are governed by Federal Rule of Civil Procedure 56(a), which provides in relevant part:

> The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.

Once a party has made a properly-supported motion for summary judgment, the opposing party may not simply rest upon the pleadings but must instead submit evidentiary materials showing that a fact either is or cannot be genuinely disputed.  Fed. R. Civ. P. 56(c)(1).  A genuine issue of material fact exists whenever "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).  The nonmoving party bears the burden of demonstrating that such a genuine issue of material fact exists.  *See*

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986); *Goodman v. Nat'l Sec. Agency, Inc.*. 621 F.3d 651, 654 (7th Cir. 2010).  It is not the duty of the Court to scour the record in search of evidence to defeat a motion for summary judgment; rather, the nonmoving party bears the responsibility of identifying applicable evidence.  *See Goodman*, 621 F.3d at 654; *Bombard v. Fort Wayne Newspapers, Inc.*, 92 F.3d 560, 562 (7th Cir. 1996).

    In evaluating a motion for summary judgment, the Court should draw all reasonable inferences from undisputed facts in favor of the nonmoving party and should view the disputed evidence in the light most favorable to the nonmoving party.  *See Estate of Cole v. Fromm*, 94 F.3d 254, 257 (7th Cir. 1996).  The mere existence of a factual dispute, by itself, is not sufficient to bar summary judgment.  Only factual disputes that might affect the outcome of the suit in light of the substantive law will preclude summary judgment.  *See Anderson*, 477 U.S. at 248; *JPM Inc. v. John Deere Indus. Equip. Co.*, 94 F.3d 270, 273 (7th Cir. 1996).  Irrelevant or unnecessary facts do not deter summary judgment, even when in dispute.  *See Clifton v. Schafer*, 969 F.2d 278, 281 (7th Cir. 1992).  If the moving party does not have the ultimate burden of proof on a claim, it is sufficient for the moving party to direct the court to the lack of evidence as to an element of that claim.  *See Green v. Whiteco Indus., Inc.*, 17 F.3d 199, 201 & n.3 (7th Cir. 1994).  "If the nonmoving party fails to establish the existence of an element essential to [her] case, one on which [she] would bear the burden of proof at trial, summary judgment must be granted to the moving party."  *Ortiz v. John O. Butler Co.*, 94 F.3d 1121, 1124 (7th Cir. 1996).

## B.  AGE DISCRIMINATION

Under the ADEA, it is unlawful for an employer "to discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's age."  29 U.S.C. ' 623(a)(1).  To prevail on their claims, each plaintiff must establish that her age Aactually motivated@ INDOT=s decision to terminate her employment.  *See  Faas v. Sears, Roebuck & Co.*, 532 F.3d 633, 641 (7th Cir. 2008) (quotations omitted).  Thus, each plaintiff must show that her age Aactually played a role in [INDOT's decision-making] process and had a determinative influence on the outcome.@  *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 141 (2000) (quotation omitted).

Plaintiffs may prove their claims through either the direct or indirect method of proof.  *See Faas*, 532 F.3d at 641.  The direct method may involve direct evidence, such as an admission by the employer or a smoking-gun, as well as circumstantial evidence suggestive of discrimination.  *See id.*  Circumstantial evidence could include suspicious timing, ambiguous statements, or behavior or comments to other employees in the protected group; evidence that similarly situated younger employees received systematically better treatment than those in the protected class; or evidence that an employee was qualified for a job but passed over or terminated in favor of younger person.  *See Hutt v. Abbie Prods. LLC*, 757 F.3d 687, 691 (7th Cir. 2014).  The question is whether there is a convincing mosaic of evidence from which a jury could conclude that discrimination occurred.  *Id.* (citation omitted).

Under the indirect method of proof each plaintiff must prove that (1) she is 40 or older; (2) her performance met INDOT's legitimate expectations; (3) despite her

16

performance, she suffered an adverse employment action; and (4) INDOT treated similarly situated employees under 40 more favorably.  *See Martino v. MCI Comm'ns Servs., Inc.*, 574 F.3d 447, 453 (7th Cir. 2009) (citing *Faas*, 532 F.3d at 641).  If Plaintiffs succeed in proving each of these elements, INDOT may provide a legitimate, non-discriminatory reason for the adverse action.  *See Faas*, 532 F.3d at 641-42.  INDOT has done so in this case; therefore, Plaintiffs may challenge the stated reasons as a pretext for discrimination.  *Id.* at 642.  The burden of proof of discrimination is always on Plaintiffs. *See Greene v. Potter*, 557 F.3d 765, 769 (7th Cir. 2009).

The ADEA also prohibits retaliation by an employer in response to an employee's complaints about discrimination.  *See* 29 U.S.C. § 623(d); *Turner v. The Saloon, Ltd.*, 595 F.3d 679, 690 (7th Cir. 2010).  To prove retaliation under the direct method of proof, Stephens must satisfy the following elements: (A) she engaged in statutorily protected activity; (B) she suffered an adverse employment action; and (C) a causal link exists between the protected activity and the adverse action.  *See Smith v. Lafayette Bank & Trust Co.*, 674 F.3d 655, 657 (7th Cir. 2012) (citations omitted).  Under the indirect method of proof, Stephens must show: (A) "she engaged in statutorily protected activity;" (B) "she met the employer's legitimate expectations;" (C) "she suffered an adverse employment action; and" (D) "she was treated less favorably than similarly situated employees who did not engage in statutorily protected activity."  *Id.* at 657-58 (citations omitted).

### III. <u>DISCUSSION</u>

Plaintiffs contend that they have direct evidence of discriminatory animus because Hazzard testified that Adams instructed him to get rid of the elderly; and Hinrichs, Stephens' supervisor at the time her employment terminated, referred to Stephens and

17

Catron as "old people."  Dkt. No. 52 at 19.  Plaintiffs also argue that there is circumstantial evidence that also shows discriminatory animus.  Specifically, there is evidence of a systematic pattern of negative treatment of older workers including Biggs, Stephens, VanDine (60), Cox (65), Hazzard (61), Catron (65), and Brown (64).  *Id.* at 20.  Further, the timing of discipline and negative evaluations of older workers is suspicious, particularly with respect to Stephens whose supervisor, Catron, told her that Jett had instructed Catron to issue Stephens a negative evaluation or risk losing his own job; and she was fired two days after complaining about discrimination.  *Id.* at 20-21.  Moreover, younger employee who were similarly-situated were treated differently than Biggs and Stephens; and it is clear that an entire department of older employees was replaced by younger workers outside the protected class.  *Id.* at 21-23.

Plaintiffs also claim that there is enough evidence of discrimination under the indirect method of proof.  Biggs asserts that she was performing her job satisfactorily and the conclusory statements of Adams and Sullivan to the contrary are disputed.  *Id.* at 25-26.  Similarly, Stephens argues that she was also performing satisfactorily in her new role and INDOT failed to follow its own procedure with respect to her WIP, which evidences discriminatory intent.  *Id.* at 26-27.  Further, Plaintiffs aver that, under a common sense approach to the similarly situated inquiry, younger employees who exhibited the same or similar behavior as Biggs and/or Stephens were not fired.  *Id.* at 27-29.

Moreover, Plaintiffs state that Biggs' evidence of pretext is the ever-shifting reasons for her termination:  first for selling Avon products; then for some ambiguous "performance issues."  *Id.* at 31-32.  With respect to Stephens, Plaintiffs contends that evidence of pretext lies with the failure of INDOT to recognize that Stephens was fired

18

despite the fact that Fox testified that he prepared her termination letter; the mid-year evaluation that her supervisor was forced to give her; INDOT's failure to follow the WIP process and failure to revise her WIP when she changed departments; and INDOT's failure to consistently enforce the "no t-shirt rule," the tardiness rules, and the "no profanity" rule. *Id.* at 32-34 & n.17.

Defendants assert that there is no direct or circumstantial evidence of discrimination. With respect to Biggs, no one ever made statements to her that were discriminatory and all of the persons to whom she compares herself were members of the protected class. Dkt. No. 45 at 13-14. Further, Biggs' subjective belief cannot overcome INDOT's evidence that she was not meeting its legitimate expectations. *Id.* at 14. Moreover, Hazzard was neither Biggs' supervisor at the time she was fired nor even an employee at INDOT; therefore, Defendants contend that his testimony is irrelevant to the question of whether or not Biggs was meeting her employer's legitimate expectations at the time she was fired. Dkt. no. 56 at 2-3. Fox's testimony does not help Biggs either, according to Defendants, because he was not handling performance issues in Biggs' department at the time she was fired. *Id.* at 4. In addition, Fox testified that there were an "inordinate" number of employees over 50 in the real estate section at INDOT, which meant that, statistically, employees who were terminated for performance issues were more likely to be older. *Id.* Defendants argue that Biggs' claim under the indirect method of proof cannot survive for similar reasons: she cannot prove she was meeting INDOT's legitimate expectations at the time she was terminated; and she cannot establish that employees outside the class were treated more favorably. Dkt. No. 45 at 15-17. Also, Adams and Sullivan honestly believed that Biggs was not performing the essential

requirements of the job and used poor judgment; Biggs has not shown otherwise, which

dooms her claim that INDOT's reasons for her termination were pretextual.  *Id.* at 18-19.

With respect to Stephens, Defendants claim that she cannot show that, at the time

of her discharge (whether by resignation or termination), she was meeting INDOT's

legitimate expectations.  Dkt. No. 45 at 20, 21-23 (discussing the direct method of proof),

24-25 (discussing the indirect method of proof); Dkt. No. 56, at 5.  Further, Defendants

argue that Stephens cannot show that she was treated less favorably than similarly

situated employees who were outside the protected class.  Dkt. No. 45. at 23-24.  In

addition, Defendants assert that Stephens has not evidenced that INDOT's reasons for

her poor performance reviews were pretext for discrimination.  *Id.* at 25.  They also aver

that Stephens cannot show any causal connection between her complaints of

discrimination and her termination/resignation because the record is devoid of written

evidence of age discrimination.  *Id.* at 27-28.  In any event, according to Defendants,

Stephens' retaliation claim fails for the same reason that her discrimination claim fails:

she was not meeting INDOT's legitimate expectations; and she has not evidence that she

was treated less favorably than similarly situated younger individuals.  *Id.* at 28; Dkt. No.

56 at 5-6.

The Court addresses Plaintiffs' arguments separately, although the evidence may

overlap.

## A.  BIGGS' CLAIM

Under either method of proof, Biggs' claim fails.  At best, Biggs' evidence reflects

a question about the real reason that her employment at INDOT was terminated:  because

of substantive performance issues or because she was selling Avon and using State

resources to do so.  Biggs has no evidence that either reason was because of her age.

Hazzard's testimony regarding Adams' alleged directive to target older employees for

discharge is too attenuated from the decision to terminate Biggs' employment in 2013 to

support any mosaic of circumstantial or indirect evidence of discrimination.  Moreover,

Biggs has not pointed to anyone similarly situated that was outside the class who was

treated differently.  Biggs admits that she thought she was being let go in favor of Don

Ballard, who was seven years older; this is not evidence of discriminatory animus based

on age.  Further, that Fox might have made a different decision that Sullivan regarding

the discipline Biggs deserved because of her misuse of State resources is not the test.

The test is whether or not there is evidence to support an inference that Sullivan

suggested termination of Biggs because of her age; there is no evidence from which such

an inference can be drawn.

For these reasons, the Court **GRANTS** Defendants' Motion for Summary

Judgment as to Biggs' claims of discrimination under the ADEA.

## B.  STEPHENS' CLAIMS

Stephens' case is not as clear cut and the Court concludes that a reasonable jury

could decide that Stephens' employment with INDOT was terminated[4] because of her

age and/or because she complained about age discrimination.  Defendants' argument

that Stephens cannot show that she was meeting reasonable expectations as a matter of

law is unpersuasive when taken in the context of comments made to her by Catron about

---

[4] Although the parties dispute whether Stephens was fired or resigned, they do not argue
that Stephens did not suffer an adverse employment action.  Therefore, reading the facts
in the light most favorable to Stephens and in the absence of any argument to the
contrary, the Court characterizes Stephens' separation from INDOT as a termination.

his disagreement with the results of her mid-year review, INDOT's failure to update and/or revise her WIP when she changed roles, and Hinrichs' reference to her and Catron as "old people."  If a jury believes that Catron provided the unfavorable review because his job had been threatened, the reasons supporting implementation of the WIP become highly suspect.  In addition, several former employees of Stephens' original department testified that the role that INDOT moved Stephens to was a dead end and there is no dispute that a younger person filled Stephens' (as well as others') position in the old department.  Further, there is no evidence in the record that any manager ever followed up with Stephens about her WIP as required.  INDOT makes much of the fact that Stephens was cited for three infractions in her new department; however, Stephens has presented enough evidence to question the validity of those infractions to survive summary judgment.  If a jury believes Stephens' witnesses they might also believe that her behavior was under a microscope for which she was cited for every infraction and other, younger employees' behavior was not.  Perhaps most importantly, Stephens has direct evidence of discriminatory intent because she testified that Hinrichs, her supervisor in the new role, referred to her and Catron as "old people."

Moreover, it is undisputed that Stephens complained at least to Fox about discrimination and he went to Sullivan to report her comments; she also reported her concerns about age discrimination to Jett.  INDOT did nothing to investigate her concerns since Sullivan told Fox not to make such an investigation and Jett never reported her concerns at all.  Stephens was fired only two days after her conversation about discrimination with Fox.  The timing alone is highly suspicious.  In the face of other evidence that, if believed by a jury, can cast doubt upon the veracity of Jett and Wasson

or their subordinates (including their failure to direct any follow through with or update of Stephens' WIP, and Hinrichs' reference to Stephens as "old people"), their vague reasons for terminating Stephens' employment could be perceived as a lie to cover discriminatory intent.

For these reasons, the Court **DENIES** Defendants' Motion for Summary Judgment as to Stephens' claims under the ADEA.

### IV.  CONCLUSION

For the reasons stated herein, the Court **GRANTS** Defendants', Brandye Henderson and Jay Wasson, Motion for Summary Judgment on the claims brought against them by Plaintiff Jacquelyn R. Biggs; and **DENIES** Defendants', Brandye Henderson and Jay Wasson, Motion for Summary Judgment on the claims brought against them by Plaintiff Sherrie D. Stephens.  The Court cannot conclude on this record that partial judgment should issue at this time; if a party believes otherwise, she or he should so move.

IT IS SO ORDERED this 27th day of August, 2015.


_____
LARRY J. McKINNEY, JUDGE
United States District Court
Southern District of Indiana



Distribution attached.

Distribution:

Jonathan Paul Nagy
INDIANA ATTORNEY GENERAL
jonathan.nagy@atg.in.gov

Kelly J. Pautler
INDIANA ATTORNEY GENERAL
kelly.pautler@atg.in.gov

Vanessa Lynne Voigt
INDIANA ATTORNEY GENERAL
vanessa.voigt@atg.in.gov

Daniel LaPointe Kent
LAPOINTE LAW FIRM P.C.
dkent@lapointelawfirm.com

Mary Jane Lapointe
LAPOINTE LAW FIRM PC
maryj@lapointelawfirm.com